UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
JAMES DARCY,

                Plaintiff,

    -against-

CITY OF NEW YORK and NEW YORK
CITY POLICE DEPARTMENT,

                Defendants.
------------------------------------------------------x

**MEMORANDUM & ORDER**

06-CV-2246 (RJD)

DEARIE, Chief Judge.

      Plaintiff James Darcy, a lieutenant with the New York City Police Department, brings this action pursuant to the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101 et seq., and New York State Executive Law § 290. Before the Court is defendants' motion for summary judgment. For the reasons set forth below, the motion is denied except to the extent of dismissing the NYPD as a non-suable entity.

## FACTUAL BACKGROUND[1]

      Plaintiff was appointed to the NYPD on January 20, 1987. On or about October 10, 1997, he was elevated to the level of lieutenant, the rank at which he continues to serve. On February 20, 1999, he was first assigned to the Narcotics Division. Following assignments in the Bronx and Brooklyn Narcotics, plaintiff was assigned on August 23, 2001 to Queens Narcotics, which plaintiff describes as a "very prestigious assignment." Defendants do not dispute this characterization. Plaintiff continued to serve in Queens Narcotics from August 2001 until he was transferred, in late 2004, to the NYPD Transit Division, District #11, in the Bronx, where he

---

[1] The Court writes here for the parties only, whose familiarity with the facts is assumed.

now serves as platoon commander.  According to plaintiff, the assignment in Transit is less prestigious than Queens Narcotics, and offers him considerably fewer overtime hours than his former position and thus adversely impacts his eventual retirement benefits.

It was when plaintiff first arrived at the 112th precinct in Queens in October of 1997 that he first met Police Officer John Doe, who was also assigned there.  It is undisputed that Doe and plaintiff socialize as friends.  The parties' papers occasionally withhold Officer Doe's true name to protect his privacy, but they also discuss openly the fact that Doe is the brother of Three-Star Deputy Chief Hall and the son of retired Two-Star Chief Francis Hall.

On or about June 3, 2004, according to plaintiff, he was called into Deputy Chief Hall's office.  The two had a conversation during which Hall said to plaintiff, "You are a lowly lieutenant and you suffer from the same disease as my brother."  Plaintiff's papers refer to this disease as "alcoholism" and "alcohol dependence" while defendants employ the term "alcoholic."  Plaintiff's complaint alleges that, upon information and belief, Officer Doe has undergone rehabilitative treatment for his disease in conjunction with programs under the auspices of the NYPD but that Doe still struggles with his disease.   Defendants are unable to confirm or deny Doe's participation in any programs concerning alleged alcohol use or rehabilitation due to applicable regulations concerning privacy.

According to plaintiff, during the June 3 conversation Hall also expressed disapproval of plaintiff's friendship with Doe, threatened to ruin plaintiff if he ever went near Doe again, and reminded plaintiff that Hall's father also disapproved of plaintiff's friendship with Doe.  The record contains no affidavit from Deputy Chief Hall or any other evidence purporting to contradict plaintiff's account of the conversation.

Plaintiff promptly reported Hall's remarks to both Deputy Director John Essig, the Commanding Officer of Queens Narcotics (and also Doe's commanding officer), and Captain Matthew Hyland.

Approximately five months later, by Memorandum dated November 7, 2004, Captain Hyland formally requested that Darcy be transferred from the Queens Narcotics Bureau "to a less sensitive position within the Patrol Services Bureau." Hyland's memorandum states that for "the past several months," Darcy "has engaged in a pattern of contemptuous and questionable behavior that has impaired his ability, integrity and judgment to supervise a narcotics module in a safe and effective manner." The memorandum outlines the incidents of alleged misconduct and, for most of the incidents, the explanations offered by Darcy that Hyland or others found to be unsatisfactory. In addition to the explanations summarized in Hyland's memo, plaintiff also addressed the particulars of Hyland's memorandum in his deposition. With one exception, the alleged performance deficiencies involve incidents or reviews occurring after the June 3, 2004 incident with Deputy Chief Hall; the one exception is the noting of deficiencies, during a review conducted on May 28, 2004, with respect to plaintiff's attitude toward case management.

The result of Hyland's memorandum was plaintiff's transfer from Queens Narcotics to Bronx Transit in December of 2004. Prior to and other than the accusations in Hyland's memorandum, no formal discipline was imposed on plaintiff during his time in Queens Narcotics. For the years 2001 and 2002 plaintiff received a "highly competent" 4.0 rating. Defendants were unable to produce plaintiff's 2003 performance evaluation, and no evaluation appears to have been completed for 2004.

Plaintiff claims that he was discriminated against by being transferred out of Queens Narcotics because he was regarded as suffering from alcoholism (*i.e*, the "same disease as" Doe)

and because he was known to have associated with Doe. The record of misconduct chronicled in Hyland's memorandum, he further claims, is pretext, assembled in order to justify the transfer but not the real reason for it. In their motion, defendants quarrel principally not with the facts but instead with plaintiff's legal theory: they claim that plaintiff cannot, as a matter of law, invoke the ADA solely on a "perceived as" or associational theory without an accompanying actual or perceived impairment in a major life activity and that, as a matter of policy, when the disability in question is alcoholism, the protections of the ADA extend only to recovering alcoholics.

## DISCUSSION

The parties' familiarity with the well-established summary judgment standards is assumed. See generally Fed. R. Civ. P. 56; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir. 2009) (record to be construed in the light most favorable to the non-moving party, all reasonable inferences must be drawn in his favor, and all ambiguities resolved his way); Gallo v. Prudential Residential Services, L.P., 22 F.3d 1219 (2d Cir.1994) (admonishes district courts in this Circuit for granting summary judgment too often; urges "cautio[n]" in employment discrimination cases because "direct" evidence of the discriminatory intent often difficult to procure).

**A.     Plaintiff's "Regarded As" Claim**

"In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA *or perceived to be so by his employer*; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he

suffered an adverse employment action because of the disability." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008) (emphasis added).

The "perceived as" language derives from the statute itself. The ADA prohibits discrimination "against a qualified individual on the basis of disability" in the "terms, conditions and privileges of employment," 42 U.S.C. § 12112(a). "Disability" defined as follows:

The term "disability" means, with respect to an individual:

*(A)* a physical or mental impairment that substantially limits one or more major life activities;

(B) a record of such impairment; or

(C) *being regarded as having such an impairment* (as described in paragraph (3)).

42 U.S.C. § 12102(1) (emphasis added).

Defendants do not dispute that alcoholism has been recognized as a "disability" within the meaning of the ADA. See generally Brennan v. City of New York, 93 CV 8461, 1997 WL 811543, *4 (S.D.N.Y. May 27, 1997) (collecting cases), aff'd, 141 F.3d 1151 (2d Cir. 1998). Defendants insist, however, that plaintiff's claim must fail as a matter of law because, even assuming he was "regarded as having" alcoholism, he was not regarded as being "substantially limit[ed] [in] one or more major life activities" within the meaning of section 12122(a)(A). Defendants argue that plaintiff has not even sought to show that he was regarded as being "substantially limit[ed] [in] one or more major life activities," and that, in any event, the fact that the NYPD assigned plaintiff to the position of platoon commander in the Bronx precludes a jury from concluding that the NYPD regarded plaintiff as being so limited.

But defendants' arguments do not take account of the statute's current language. Added to the definition of disability in the 2008 amendments is a paragraph that expressly exempts

"regarded as" claimants from having to show that the disability they are perceived as having substantially limits a major life activity. To wit, as quoted above, "disability" includes "being regarded as having such an impairment (as described in paragraph 3)," and the referenced paragraph 3 provides:

> (3) Regarded as having such an impairment
>
> For purposes of paragraph (1)(C):
>
> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*

42 U.S.C. § 12102(3) (emphasis added).[2]

Thus, under the plain language of the statute, an employee making a "regarded as" claim is not required to show that the disability he is perceived as suffering from is one that actually

---

[2] The referenced "paragraph 3" was added by the ADA Amendments Act of 2008, PL 110-325 which became effective January 1, 2009. The section expressly overruled Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), under which "perceived as" claimants were required to show that their employers believed them to be impaired in a major life activity or unable to work in a broad class of jobs.

The fact that the Amendments became effective on January 1, 2009 of course presents the question of retroactivity. Neither the fact of the Amendments nor the question of retroactivity was briefed by the parties. In its preamble, Congress declares the Amendments to be "[a]n Act *[t]o restore* the intent and protections of the Americans with Disabilities Act of 1990." PL 110-325 (emphasis added). The "findings" section announces that "the holdings of the Supreme Court in Sutton [ ] and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect," PL 110-325 §§ 2(a)(4), and in the "purposes" section Congress declares its intent "to reject the Supreme Court's reasoning in Sutton [ ] with regard to coverage under the third prong of the definition of disability and *to reinstate* the reasoning of [earlier authority]." Id., (b)(3) (emphasis added). Nevertheless, because Congress did not expressly provide for retroactive application in the Amendments but instead announced an effective date of January 1, 2009, many federal courts have concluded that the Amendments do not apply retroactively to conduct occurring before that date. See Nyrop v. Indep. Sch. Dist, 616 F.3d 728,734 n.4 (8th Cir. 2010) (collecting cases from First, Fifth, Sixth, Seventh, Ninth and D.C. Circuits). The Second Circuit, however, has not yet addressed the question.

limits, or is perceived to limit, a major life activity. To the contrary, cognizable ADA injury occurs when an employer takes an adverse employment action against an employee because of its perception that the employee suffers from a recognized disability. Defendants cling to the notion that ADA protections are not triggered unless there in fact exists an underlying impairment, but this theory is irreconcilable with the plain statutory language. "[B]eing regarded as having" an impairment is singled out as a distinct, alternative definition of disability, and individuals making such a claim are expressly relieved of having to show an actual or the perception of an actual impairment. Obviously, the statute recognizes that perceptions about disabilities carry stigma enough and that, when these perceptions are the motivating force in an employment decision, they often become agents of the improper biases and prejudices associated with the disability (real or imagined) in question. The statute does not require that an individual seeking its protections show that the employer had a reasonable basis for perceiving him as suffering from a disability; it merely requires him to show that the employer did so perceive him. Indeed, the fact that plaintiff does not (or at least has not claimed to) suffer from the disability he is regarded as having, rather than militating against him, serves instead to expose the action taken against him to have been all the more the result of the biases associated with the disability rather than legitimate concerns. In short, defendants' focus on the import of an actual disability to the present analysis misses the point of "perceived as" disability claims, namely, that they often reflect a *mistaken* perception. See, e.g., Larimer v. Int'l Business Machines Corp., 370 F.3d 698, 700 (7th Cir. 2004) ("[when] the individual is *mistakenly* regarded by his employer as having a disability[,] such *mistake* is an alternative trigger of the [ADA]'s protections") (emphasis added), cert. denied, 543 U.S. 984 (2004).[3]

---

[3] Defendants also argue that as a matter of policy, when the disability in question is

Returning to the facts here, defendants' all but conceded at oral argument, and I now conclude for purposes of the summary judgment motion, that a rational jury could find that plaintiff was regarded as suffering from alcoholism. I further conclude that the record permits a jury to infer that that mistaken perception motivated the ensuing employment actions taken against plaintiff. Deputy Chief Hall's remarks speak for themselves, plaintiff relayed the substance of those remarks to his two supervisors, and it was one of them (Hyland) who was instrumental in having plaintiff transferred out of narcotics. To be sure, it may also have been the case that Hall, because of the nature of his relationship to Doe, was motivated by other

---

alcoholism, whether actual *or perceived*, the protections of the ADA extend only to *recovering* alcoholics, and so plaintiff's claim must fail because he does not claim (nor does the evidence allow a jury to find) that he was regarded as a being a *recovering* alcoholic. To be sure, the subject of alcoholism presents something of a special case and is directly addressed by the statute. The ADA provides, *inter alia*, that an employer "may hold an employee who [ ] is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the [ ] alcoholism of such employee." 42 U.S.C. § 12114(c)(4). Allowing an officer who is abusing alcohol to remain on duty of course creates a danger both to the officer as well as to the public, Brennan, 1997 WL 811543 at *4-6, and so defendants are correct in asserting that, because "the ADA does not require the lowering of performance standards to accommodate [ ] alcoholism," Brennan, 1997 WL 811543 at *5, as a practical matter, only alcoholics in recovery trigger the ADA's protections. See id. at *5-6 (collecting cases in which adverse employment actions tied to an employee's alcoholism have been held not to violate the ADA). But defendants have offered no authority for the proposition that in the context of a "perceived as" claim, a plaintiff can recover only if he shows he was mistakenly perceived as a recovering alcoholic but not if he was perceived as an actual alcoholic; even if this were the law, they have not shown how, as a factual matter, the court would draw the line between recovering and non-recovering at the summary judgment stage. In any event, plaintiff's claim is that he was perceived as having the "same disease as" Doe, and what little the record reveals about Doe neither establishes nor precludes a jury from concluding that he was "recovering" from his disease.

Finally, in plaintiff's case, *either* perception (that he is an active, or a recovering alcoholic) would be a mistaken one, and such mistaken perceptions independently trigger the ADA's protections. Larimer, 370 F.3d at 700.

considerations and did not, despite his remarks, harbor a genuine belief that plaintiff was an alcoholic. But that is a matter for the jury to decide.

Furthermore, on this record, the question of pretext is for the jury rather than this Court to decide. Despite the number of incidents of unsatisfactory performance chronicled in Hyland's memorandum requesting plaintiff's transfer, all but one of the incidents post-date the June 3, 2004 exchange between plaintiff and Hall, and other than that document, plaintiff's record was more than satisfactory (as noted, for the years 2001 and 2002 plaintiff was rated 4.0 or highly competent; defendant was unable to produce plaintiff's 2003 performance evaluation; and no evaluation appears to have been completed in 2004). The inference in plaintiff's favor speaks for itself; *i.e.*, the record permits a jury to infer that, following the June 3 incident, Hall and Hyland harbored a desire to have plaintiff transferred out of Queens Narcotics, and to advance that goal, caused plaintiff to be assessed, and his deficiencies to be documented, more thoroughly than they would have were they not seeking to build a case against him. At the very least, I cannot conclude that "the evidence to support [plaintiff's claim of pretext] is so slight" that "no rational jury could find in [his] favor." Gallo, 22 F.3d at 1224.

Likewise, although not seriously contested by defendants, I conclude that the record plainly presents a jury-worthy issue as to whether the transfer out of Queens Narcotics was adverse. See Patrolmen's Benevolent Ass'n of New York v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002) (employment action is sufficiently adverse for ADA purposes if it "resulted in a less distinguished title and significantly diminished material responsibilities") (internal quotation marks omitted), cert. denied, 538 U.S. 1032 (2003).

**B.     The Association Theory**

Resting on essentially the same facts as plaintiff's claim that he was wrongly perceived to be an alcoholic is his separate claim that he was transferred out of Queens Narcotics because of his "association with" Doe and Doe's alcoholism.

Returning to the statute, the ADA provides that "the term 'discriminate against a qualified individual on the basis of disability' as used in the statute's basic proscription (i.e., "[n]o covered entity shall discriminate against a qualified individual on the basis of disability. . . in the "terms, conditions and privileges of employment," 42 U.S.C. § 12112(a) means, *inter alia*,

> (4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

42 U.S.C. § 12112(b)(4).

A seminal decision construing this section is the Seventh Circuit's opinion in Larimer:

> Three types of situations are, we believe, within the intended scope of the rarely litigated (this is our first case) association section. We'll call them "expense," "disability by association," and "distraction." They can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because (1) ("expense") his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ("disability by association") the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ("distraction") the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours.

Id., 370 F.3d at 700.[4]

Deputy Chief Hall's remarks plainly preclude summary judgment against plaintiff on his claim under the second of Larimer's examples, *i.e.,* that he was transferred out of narcotics because of his known association with Doe and Doe's disability.

The other elements that plaintiff must establish under this theory do not differ from his "perceived as" theory and thus do not require separate discussion. See Larimer, 370 F.3d at 701-02 (a plaintiff must establish that: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) her case falls into one of the three relevant categories of expense, distraction, or association). Accordingly, plaintiff survives summary judgment under the association theory as well.

C.  **Retaliation**

Plaintiff further claims that he was retaliated against after complaining about his December 2004 transfer from Queens Narcotics to Bronx Transit. The record shows that on February 8, 2005, plaintiff filed a complaint with the NYPD's Office of Equal Employment Opportunity (OEEO) charging that the transfer was the result of the perception that he was an alcoholic, and on March 24, 2005, filed a similar charge with the New York State Division of Human Rights (SDHR). Two months later, on May 20, 2005, the NYPD filed disciplinary charges against plaintiff. The charges accused plaintiff of having failed to investigate after being informed of serious misconduct committed by officers assigned to the Queens North Narcotics Initiative. More than two years later, on August 2, 2007, the NYPD Assistant

---

[4] The Second Circuit has not formally construed the association provision, but Larimer has been cited approvingly in a recent dissenting opinion. See Loeffler v. Staten Island University Hospital, 582 F.3d 268, 286 (2d Cir. 2009) (Jacobs, C.J., dissenting).

-11-

Department Advocate moved to dismiss the charges. The motion stated that the Department could not prove that plaintiff had, in fact, failed to report possible misconduct, but also stated that the "Department's main reason" for seeking dismissal was the failed memory and unavailability of one witness and the unavailability (due to retirement) of another. The Deputy Commissioner of Trials granted the dismissal on October 31, 2007 and the Police Commissioner gave final approval on April 29, 2008. Conceding that the investigation that led to the charges had begun before he filed his OEEO and SDHR complaints (although the record does not indicate how far in advance), plaintiff nevertheless claims that the ripening of the investigation into actual charges, and the ensuing three-year delay in resolving them, were in retaliation for his filing of the OEEO and SDHR complaints.

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The ADA also makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

To state a prima facie case of retaliation, plaintiff must show that (1) he was engaged in a protected activity under the ADA, (2) the employer was aware of the activity, (3) an adverse employment action occurred with respect to plaintiff, and (4) a causal connection exists between the protected activity and the adverse employment action. See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.1999). ADA retaliation claims are subject to the same burden-shifting framework applied to Title VII retaliation claims, see Lovejoy-Wilson

v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001), so once plaintiff establishes a prima facie case, the employer must proffer a "legitimate, nonretaliatory reason for the challenged employment decision." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). If the employer has done so, plaintiff must then provide evidence sufficient for a rational jury to conclude that the proffered reason is a pretext for retaliation. Id.

Defendants argue that, as a matter of law, the disciplinary charges filed in May 2005 cannot constitute an adverse action because they were ultimately dismissed three years later, whereas plaintiff relies on the dismissal of the charges as inferential proof that they lacked a good faith basis in the first place and were brought to retaliate against him for engaging in protected activity.

No authority supports the defendants' sweeping proposition. To the contrary, the Supreme Court's extensive discussion of retaliation in the analogous Title VII context makes clear that the adversity of actions claimed to be retaliatory may be insidious rather than obvious. See generally Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). Indeed, in Burlington Northern, the Supreme Court expressly rejected the employer's claim that a 37-day suspension without pay was not adverse for purposes of a retaliation claim merely because the investigation was rescinded and the employee reinstated with full back pay. See id., 548 U.S. at 71-72. The pendency of charges with a questionable factual basis unquestionably affects the "terms, conditions and privileges of employment" of the employee against whom they were brought. Pertinent here for summary judgment purposes is the explanation advanced in the motion seeking dismissal of the disciplinary charges: put simply, the motion raises more questions than it resolves about the bona fides of the charges. The circumstances at least permit,

although they do not require, the inferences that support plaintiff's claim of retaliation and thus preclude the entry of summary judgment in favor of the party who brought the charges.

The fact that the *investigation* that led to the charges began at an unspecified time before plaintiff filed his OEEO and SDHR does not weigh prominently in defendants' opposition. To be sure, "[e]mployers need not suspend previously planned transfers upon discovering that [a discrimination complaint] has been filed, and proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark v. County Schol District v. Breeden, 532 U.S. 268, 272 (2001). Here, however, defendants have not established that *charges* were planned and, in any event, it is plaintiff's contention that the filing of his OEEO and SDHR complaints fueled the then-nascent investigation, and the totality of the circumstances at least permit that inference. Furthermore, although plaintiff may not have a smoking gun on causality—and few who are the victims of retaliation do—the chronology permits an inference in his favor: the charges were brought less than three months after the OEEO complaint and only two months after the SDHR complaint. Cf. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (error to grant summary judgment dismissing the plaintiff's retaliation claim for lack of evidence of a causal connection where, *inter alia,* her "discharge came less than two months after she filed a complaint with [defendant's] management").

**D.  Proper Defendants**

The NYPD, however, is entitled to summary judgment in its favor. As an agency of the City of New York, the NYPD may not be sued separately. See N.Y. City Charter Ch. 17, § 396; Petway v. City of New York, 02 CV 2715, 2005 WL 2137805, *3 (E.D.N.Y. Sept. 2, 2005); Allan v. City of New York, 386 F. Supp. 542, 545 (S.D.N.Y. 2005).

## CONCLUSION

Defendants' motion for summary judgment is granted solely to the extent of dismissing all claims against the NYPD but is in all other respects denied. The case shall proceed to trial. Counsel shall appear for a status conference in Courtroom 10A on April 8, 2011, at 11:30 a.m. SO ORDERED.

Dated: Brooklyn, New York
       March 8, 2011

                                          s/ Judge Raymond J. Dearie
                                          _____
                                          RAYMOND J. DEARIE
                                          United States District Judge